IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
December 12, 2008 Session

## EDDIE WAYNE GORDON v. STATE OF TENNESSEE

**Direct Appeal from the Circuit Court for Gibson County**
**No. 12785     Jerry Scott, Judge**

---

**No. W2008-01172-CCA-R3-PC  - Filed May 11, 2009**

---

The state appeals the post-conviction court's grant of post-conviction relief to the petitioner, Eddie Wayne Gordon. The state argues that the post-conviction court erroneously determined that the petitioner did not voluntarily and understandingly enter his plea of guilty to first degree murder. Upon our review of the record and the parties' briefs, we reverse the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed**

J.C. McLin, J., delivered the opinion of the court, in which John Everett Williams and Camille R. McMullen, JJ., joined.

Danny R. Ellis, Jackson, Tennessee, for the appellee, Eddie Wayne Gordon.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel E. Willis, Assistant Attorney General; Garry Brown, District Attorney General; and Matthew Hooper, Assistant District Attorney General, for the appellant, State of Tennessee.

**OPINION**

**BACKGROUND**

This case represents a long procedural history. The record reflects that on the morning of August 12, 1983, the petitioner set his ex-girlfriend's sister's house on fire. When the petitioner's ex-girlfriend and her sister came out of the house, the petitioner shot and killed his ex-girlfriend, who was carrying their young child. The petitioner confessed to starting the fire and killing the victim and was indicted for first degree murder and arson. He pled guilty to first degree murder, and the trial court sentenced him to life imprisonment. The petitioner timely filed a pro se petition for post-conviction relief, which the trial court dismissed in 1985 without an evidentiary hearing. In 1986, this court ordered the trial court to appoint counsel and afford the petitioner an evidentiary hearing. *See Eddie Wayne Gordon v. State*, No. 2, 1986 WL 1254 (Tenn. Crim. App., at Jackson, Jan. 29, 1986). Although counsel was appointed, an evidentiary hearing was never held, and the trial

court dismissed the petition for failure to prosecute in 1987. The case "languished in the system," and in 2004, this court again ordered the trial court to conduct an evidentiary hearing. *Eddie Wayne Gordon v. State*, No. W2003-02376-CCA-R3-PC, 2004 WL 1047606 (Tenn. Crim. App., at Jackson, May 7, 2004).

In January 2005, appointed counsel filed an amended petition for post-conviction relief, claiming that the petitioner received the ineffective assistance of counsel because his trial attorneys did not seek an independent psychiatric evaluation for him and that his guilty plea was involuntary. After amendments and supplements to the original petition were filed, an evidentiary hearing was held on March 21, 2005. The following is a summary of the evidence presented at the hearing:

> Tim Mullins testified for the petitioner that he was the petitioner's cousin. On the night of August 11, 1983, the petitioner came to Mullins' house, and they watched television. The petitioner did not appear to be his usual self and was very quiet. Mullins had known the petitioner to drink alcohol and smoke marijuana, but Mullins did not see the petitioner use those substances that night. The petitioner and the victim had been having disagreements about their child, and the petitioner's baby "meant everything in the world to him." The petitioner's trial attorneys never interviewed Mullins.
>
> Barbara Collins, the petitioner's mother, testified that she, her aunt, and her mother talked with the petitioner's trial attorneys in the judge's chambers on October 24, 1983, the day of the petitioner's guilty plea. The attorneys wanted the petitioner to accept the State's plea offer, but the petitioner did not want to plead guilty. The attorneys told Collins and her family to convince the petitioner to accept the State's plea offer, and one of the attorneys told her that he would only represent the petitioner if the petitioner accepted the offer. At some point, the attorneys left Collins and her family alone with the petitioner. Collins was afraid the petitioner would get the death penalty at trial, and she and her family wanted the petitioner to accept the State's offer. While they talked with the petitioner, the trial judge came into the room. The petitioner never denied killing the victim but kept saying that he wanted to go to trial. On cross-examination, Collins testified that the petitioner's attorneys probably talked with her about the petitioner's options but that she did not remember their conversation. She acknowledged that she was afraid the State would seek the death penalty against the petitioner and that she encouraged him to plead guilty. She thought that if the petitioner pled guilty, he would be released from prison in about ten years.
>
> Earline Mullins, the petitioner's great-aunt, testified that she met with the petitioner's attorneys on the day of the guilty plea and that the attorneys told the petitioner he would get a ninety-nine-year sentence with no possibility of parole if he did not accept the State's offer. They also told the petitioner that "we're not going back in the courtroom until [you take] the plea bargain." The attorneys told him that he would get life with parole in thirty years if he pled guilty. The petitioner replied, "I'd rather jump out that window." The attorneys left the room, and Mullins and her

-2-

family talked with the petitioner about the State's offer. Mullins acknowledged that she and her family "pounded on" the petitioner in order to get him to accept the State's offer, and she said she never saw the trial judge in the room while they talked with the petitioner. The petitioner was living at her house at the time of the crimes, but the petitioner's attorneys never interviewed her. On cross-examination, Mullins testified that she did not remember hearing the attorneys say anything about the death penalty. Nevertheless, she and her family advised the petitioner to plead guilty because "we thought it'd be best for him to get out on parole."

One of the petitioner's trial attorneys testified that he started practicing law in 1979 and was appointed to represent the petitioner in August 1983. He described his recollection of the case as "fair" and said that he did not remember any of his conversations with the petitioner. However, his notes from the case reflected that he and co-counsel talked with the petitioner about the facts of the case and that he talked with the petitioner and the petitioner's family on the day of the guilty plea. Counsel did not remember if he visited the crime scene, but he interviewed witness Tommy Hunt. Counsel also had some witnesses' statements. Counsel remembered telling the petitioner that the petitioner faced the possibility of the death penalty. The State offered to let the petitioner plead guilty in return for a life sentence, and counsel talked with the petitioner about "the pros and the cons" of the State's offer. Counsel told the petitioner that the State had to prove its case beyond a reasonable doubt, but he did not remember explaining the difference between first and second degree murder to him. He and the petitioner discussed possible defense strategies such as an alibi and an insanity defense. However, the petitioner told counsel that he had been upset with the victim for quite some time, had thought about killing her for hours, and had planned the killing.

Counsel acknowledged that doctors evaluated the petitioner at the Gibson County Mental Health Center and found the petitioner to be competent. Counsel did not interview the doctors who conducted the evaluation but had no reason to doubt their competency finding. Counsel did not know if the petitioner's doctors were state employees and was not concerned that the doctors were pressured into finding the petitioner competent. The State believed it had a good case for the death penalty but offered to let the petitioner plead guilty to life with the possibility of parole. On October 24, 1983, counsel and co-counsel met with the petitioner and the petitioner's family in order to discuss the State's offer. Counsel was concerned that the jury would be enraged by the facts of the case, and counsel advised the petitioner about the consequences of not accepting the State's offer. The attorneys told the petitioner and his family about the possibility of the death penalty and allowed the petitioner and his family to talk privately. Counsel stated that he did not remember the trial judge coming into the room while he talked with the petitioner and the petitioner's relatives and that he did not remember threatening the petitioner or giving the petitioner an ultimatum. That same day, counsel filed a motion for the petitioner to have an independent psychological evaluation. He said he filed the motion just in case the first evaluation became insufficient and to preserve the issue. If the

petitioner had not pled guilty, counsel would have argued the motion to the trial court. Counsel read the petitioner's police confession and also would have argued a motion to suppress if the petitioner had not pled guilty. He said he did not remember telling the petitioner's mother that the petitioner would get out of prison in ten years.

On cross-examination, counsel testified that he could communicate with the petitioner and that the petitioner was always responsive. The petitioner never denied shooting the victim and never indicated that his confession to police was involuntary. Counsel was unaware of any reason to suppress the petitioner's confession, and counsel would have represented the petitioner at trial. The petitioner appeared to have no defenses to the crimes, but counsel could have argued that the petitioner did not premeditate the killing.

Co-counsel testified that he had been practicing law since 1979, was appointed to represent the petitioner, and began preparing for the petitioner's trial. The defense attorneys talked with the victim's sister at the preliminary hearing and talked with sheriff's department personnel. The defense had copies of the petitioner's confession, and co-counsel talked with the petitioner about the case. The petitioner's attorneys discussed second degree murder with him, but given the petitioner's confession, co-counsel thought "the likelihood of that . . . [was] slim and none." The attorney general told co-counsel that this was a death penalty case, and the State refused to make a plea offer. However, the State later offered to let the petitioner plead guilty in return for a sentence of life without the possibility of parole. Co-counsel refused that offer. About one week before the petitioner's guilty plea, the State offered to let the petitioner plead guilty to life. Co-counsel visited the petitioner in jail, told him about the offer, and told him to think about it. On October 24, 1983, the petitioner's attorneys talked with him again about the State's offer. The petitioner told co-counsel that he did not know what to do, and the petitioner discussed the offer with relatives. Co-counsel thought it was in the petitioner's best interests to accept the offer, and he did not remember the petitioner's saying that he did not want to plead guilty. He said that the trial judge was not present in the conference room on October 24 and that the petitioner "got a sweet deal." Co-counsel acknowledged filing a motion to suppress the confession and said he would have argued the motion if the petitioner had not pled guilty. On cross-examination, co-counsel testified that he had no concerns about the petitioner's mental capacity. He believed the petitioner confessed to police voluntarily and pled guilty voluntarily. Co-counsel did not force the petitioner's family to convince the petitioner to accept the State's offer, and neither of the petitioner's attorneys was afraid to go to trial.

The petitioner testified that co-counsel told him about the State's offer and told him to think about it. On October 24, 1983, both attorneys talked with him about the offer. At some point, the attorneys took the petitioner into a room behind the judge's chambers, and the petitioner told co-counsel that he did not want to plead guilty.

-4-

Co-counsel told the petitioner that he was not going to allow the petitioner to testify and that he would not represent the petitioner at trial. Before the petitioner's family came into the conference room, the trial judge came into the room and told the petitioner "the likelihood that [if] I didn't [accept the State's offer,] he would be sentencing me to death row." The judge was in the room for three to five minutes, and the petitioner "was terrified that if I didn't take the plea that what he said was going to be true." The petitioner decided to accept the State's offer because he was not receiving proper representation, his family wanted him to plead guilty, and he was afraid of what the trial judge told him.

The petitioner testified that on the afternoon of August 11, 1983, the victim told him that he could not see their child. That night, the petitioner was angry and unable to sleep. About 5:00 a.m. on August 12, the petitioner telephoned the victim. He acknowledged that his conversation with her "ticked [him] off" and caused him to commit the crimes. He said that if he had gone to trial, the evidence would have shown that he acted in the heat of passion. He believed that a jury would have convicted him of second degree murder because the killing was based on anger and rage. After Tommy Hunt drove the petitioner to the sheriff's department, the petitioner walked inside, told a police dispatcher that he had shot someone, and told the dispatcher that he "might need an attorney." A police officer put the petitioner into an interview room, and Officer Joe Shepherd came into the room and began asking the petitioner questions about the crimes. Shepherd did not advise the petitioner of his rights. The petitioner told Shepherd that he might need an attorney and had not slept. Shepherd told the petitioner that he could sleep after the petitioner gave a statement. The petitioner acknowledged that he gave an audiotaped confession and that a transcript of his confession showed Shepherd advised him about his rights. The petitioner testified that he did not know if he understood his right to an attorney or his right against self-incrimination. He said that the victim's sister's neighbor, Ruby Merrick, testified at the preliminary hearing that she saw another person at the scene of the crimes and that Merrick could have testified for him at trial. The petitioner tried to tell one of his attorneys about the circumstances of the offenses, but the attorney would not listen to him.

The petitioner testified that he did not recall talking with his attorneys about the State's burden of proof, premeditation, or deliberation and that the attorneys never talked about the aggravating or mitigating factors the State would have to prove in order for the petitioner to get the death penalty. Regarding his psychological evaluation, the petitioner testified that Dr. Nicholas House met with him for forty-five minutes but did not give him any psychological tests. About one week later, the petitioner met with Dr. Alvin Summar. Dr. Summar only looked over some paperwork, and the petitioner told his attorneys that he did not receive an adequate mental evaluation.

On cross-examination, the petitioner testified that he was not denying he killed the victim. However, he said that he did not set fire to the victim's sister's home and that

-5-

the house was on fire when he arrived. He said that he had been to juvenile court about seventeen times over prior incidents but that he was not familiar with the legal system. The petitioner acknowledged that he obtained his GED and an apprenticeship certification in residential electrical wiring while in prison. He also earned a diploma from the Cleveland Institute of Electronics and Electronic Technology, completed several Bible study courses, and worked for the disciplinary board. He acknowledged that a jury could have convicted him of first degree murder and that he was concerned about the death penalty. However, he did not think the killing warranted that punishment. He acknowledged that at the guilty plea hearing, the trial court advised him of his rights and that he would be sentenced to life with the possibility of parole after serving thirty years in confinement. At the guilty plea hearing, the petitioner told the trial court that he understood the charges against him, that he wanted to plead guilty, that counsel went over a guilty plea form with him, that he was satisfied with his attorneys' representation, that he was pleading guilty voluntarily, and that he had not been pressured into pleading guilty. He testified that he lied to the trial court and that he pled guilty because he was pressured by counsel and intimidated by the trial judge. He acknowledged attending a recent parole hearing and said that he may have told the parole board he set fire to the victim's sister's home by throwing a cigarette into a trash can. However, the petitioner testified that he may have lied to the parole board because he was trying to get out of prison.

Tommy Hunt testified for the State that he was a minister in Bradford, Tennessee at the time of the crimes. On the morning of August 12, 1983, the petitioner came to Hunt's home and knocked on the door. Hunt had never met the petitioner before that morning but talked with the petitioner about the crimes for fifteen or twenty minutes. The petitioner asked Hunt to drive him to the sheriff's department, and Hunt and his father-in-law drove the petitioner to the sheriff's department in Trenton, Tennessee. The petitioner was unusually calm, did not appear to be under the influence of alcohol, and appeared to understand what the petitioner was doing and saying. On cross-examination, Hunt testified that when they arrived at the sheriff's department, he went inside with the petitioner and told an officer, "This gentleman would like to say something to you."

Joe Shepherd, the Gibson County Sheriff, testified that he was the lead investigator in the case and interviewed the petitioner on August 12, 1983. The petitioner signed a waiver of rights form, and Shepherd recorded the petitioner's statement. During the petitioner's interview, the petitioner admitted setting fire to the house in order to get the victim to come outside. The petitioner did not appear to be under the influence of any substance and told Shepherd that he did not use alcohol or drugs. Shepherd interviewed Ruby Merrick, and she did not tell him that she saw someone other than the petitioner at the scene of the crimes. Shepherd made his case file available to the petitioner's attorneys and withheld nothing from them. On cross-examination, Shepherd testified that he always Mirandized suspects. He identified a transcript of the petitioner's confession and acknowledged that the transcript demonstrated that

the petitioner made some statements about the crimes before Shepherd Mirandized him. He said the petitioner was "jumping through his skin to make a statement" and acknowledged that the petitioner may have blurted out some information before he could read him *Miranda* warnings. He acknowledged that the petitioner was not free to leave at the time of the confession.

The State recalled the petitioner's attorneys to the stand, and both attorneys testified that the petitioner never claimed that he requested an attorney or that he be allowed to sleep before his interview with Joe Shepherd. Co-counsel also stated that Ruby Merrick did not testify at the petitioner's preliminary hearing and that the petitioner never claimed someone else started the fire.

*Eddie Wayne Gordon*, No. W2005-02330-CCA-R3-PC, 2006 WL 1205596 *1-4 (Tenn. Crim. App., at Jackson, May 4, 2006) (internal footnote omitted). The post-conviction court, by written order, denied post-conviction relief, finding that the petitioner received the effective assistance of counsel. On May 4, 2006, this court affirmed the post-conviction court's judgment but noted that the court failed to address the voluntariness of the petitioner's guilty plea. Consequently, this court remanded the case in order for the post-conviction court to make findings of fact and determine whether the petitioner's guilty plea was knowingly and voluntarily entered. *See id.* at *7.

Upon remand, the post-conviction court held the evidentiary hearing on December 17, 2007. At the hearing, the transcript of the 1983 plea acceptance hearing was entered as an exhibit. The post-conviction court also granted the state's motion to consider the aforementioned testimony presented in the previous post-conviction hearing. The petitioner then testified that he was under the care of a psychiatrist or psychologist when he pled guilty. He further asserted that he was taking several medications, which caused him to be confused and disoriented. The petitioner stated that the trial court never explained his "right not to testify against [himself]," or his right to compel witnesses to appear and testify on his behalf. On cross-examination, the petitioner acknowledged he had pled guilty to a larceny charge committed while he was a juvenile a few years prior to pleading guilty to murder. The petitioner stated that he completed eighth grade in school, and had received his GED while incarcerated. The petitioner also acknowledged that he had completed some vocational courses while incarcerated. The petitioner conceded that he had not previously alleged he was under the influence of medication when he entered his guilty plea.

By order entered April 29, 2008, the post-conviction court granted relief, finding that the petitioner's guilty plea was not knowingly and voluntarily entered. Based on its review of the record, the post-conviction court made the following findings relevant to the petitioner's guilty plea:

In this case, the trial judge informed the Petitioner of his right to a jury trial, the fact that the jury would determine the issue of guilt, and if they found him guilty, the jury would sentence him to the death penalty or life imprisonment with no parole or right to work release until he had served at least 30 years. The judge had a written guilty plea form before him. The judge asked the Petitioner if he read and signed it, and the Petitioner said that he did. The judge asked if the guilty plea form was explained to him by his attorneys, and the Petitioner said they had explained it to him. (The guilty

plea form was not introduced at either post conviction relief hearing).  The judge also asked the Petitioner if he was satisfied with his counsel's advice, and the Petitioner said he was.  When asked if his counsel had explained the waiver to him, he said [counsel] had.  The judge asked the Petitioner if he understood he was admitting guilt of murder in the first degree by his guilty plea, and the Petitioner said he understood.  The judge asked if [the Petitioner] had "given this a lot of thought and discussed this many times with your lawyers," and the Petitioner answered "[y]es sir."  The Judge further asked if the plea was "of your own free will and volition," and the Petitioner said "[y]es, sir."  The Petitioner said no when asked if "anybody put any pressure on you to do this."  The judge asked if he understood what he was doing, and the Petitioner said "[y]es, sir."  Finally, the judge asked the Petitioner if he had any questions, and he said, "[n]o, sir."  The judge then asked if the Petitioner pleaded guilty of murder in the first degree, and the Petitioner said "[y]es sir."

During the colloquy between the Court and the Petitioner, the Petitioner answered 25 questions with "[y]es, sir" and three questions with "[n]o, sir."  Twice, he was asked if he had any questions, and once he was asked if anyone had put any pressure on him and the response to all three was "[n]o, sir."

He was asked three questions, which required answers other than "yes, sir" or "no, sir", to wit: his age (19), his date of birth (December 18), and how far he went in school (ninth grade).  Except to answer those 31 questions as herein above set forth, the Petitioner did not speak at the guilty plea hearing.

The trial judge did not address the Petitioner personally to inform him of his constitutional privilege against compulsory self-incrimination or his constitutional right to confront his accusers as required by [*State v. *]*Mackey*.  As a result, the record is silent as to whether the Petitioner was informed of those constitutional rights and whether he waived them.  Therefore, pursuant to the United States Supreme Court's decision in *Boykin*, 395 U.S. at 243, this Court cannot presume that the Petitioner knowingly waived [those] constitutional rights from a silent record, and thus, this Court must find that the Petitioner did not voluntarily and understandingly enter his plea of guilty.

The state appealed.

## STANDARD OF REVIEW

On appeal, this court is bound to the post-conviction court's findings of fact unless the evidence preponderates against those findings. *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). Our review of the post-conviction court's factual findings is de novo with a presumption that the findings are correct. *Fields v. State*, 40 S.W.3d 450, 457-58 (Tenn. 2001). Our review of the post-conviction court's legal conclusions and application of law to facts is de novo without a presumption of correctness. *Id.*

**ANALYSIS**

In the instant appeal, the state contends that the post-conviction court erred in finding that the petitioner's plea was not knowingly and voluntarily entered. Specifically, the state argues that the record reflects that the trial court substantially complied with *Boykin v. Alabama* and *State v. Mackey*. The state further argues that, "even if the trial court failed to adequately advise the petitioner of his rights during the plea colloquy, the error was harmless beyond a reasonable doubt because the record clearly shows that the petitioner knowingly, voluntarily, and understandingly entered his guilty plea."

When analyzing a guilty plea, we look to the federal standard announced in *Boykin v. Alabama*, 395 U.S. 238 (1969) and the state standard set out in *State v. Mackey* 553 S.W.2d 337 (Tenn. 1977) *superseded on other grounds by rules of criminal and appellate procedure*. In *Boykin*, the United States Supreme Court held that there must be an affirmative showing by the trial court that a guilty plea was knowingly and voluntarily given before it can be accepted. *Boykin*, 395 U.S. at 242. The Court explained that fundamental to this affirmative showing was the admonition of certain constitutional rights which are implicated in a guilty plea, namely, the right to a trial by jury, the right to confront witnesses, and the privilege against compelled self-incrimination. *Id*. at 243. The Court noted that the waiver of these rights cannot be presumed from a silent record. *Id*. Similarly, in *Mackey*, our Tennessee Supreme Court required an affirmative showing of a voluntary and knowing guilty plea; namely, that the defendant has been aware of the significance and consequences of such plea. *Mackey*, 553 S.W.2d at 340 (including additional safeguards in taking the plea beyond *Boykin* to better assure that plea is entered knowingly and voluntarily). *See also* Tenn. R. Crim. P. 11. (incorporating *Mackey* litany).

If the trial court substantially complies with the litany of constitutional rights mandated, there is no error. *State v. Neal*, 810 S.W.2d 131, 137 (Tenn. 1991) *overruled in part by Blankenship v. State*, 858 S.W.2d 897 (Tenn. 1993). A trial court substantially complies with these mandates when it expresses the sense of the substance of the required advice to a defendant who is seeking to plead guilty. *Id*. Substantial compliance means that "the root purpose of the prescribed litany has been served and the guilty plea passes due process scrutiny because it was made voluntarily and understandingly." *Howell v. State*, 185 S.W.3d 319, 331 (Tenn. 2006) (quoting *Neal*, 810 S.W.2d at 138).

In those instances of a patent omission from the advice litany, the error may still be harmless if the state meets its burden of showing the plea was nonetheless knowingly and voluntarily entered. *Bates v. State*, 973 S.W.2d 615, 624-25 (Tenn. Crim. App. 1997). *See also State v. Rodriguez*, 254 S.W.3d 361, 371 (Tenn. 2008). The petitioner's age, level of education, intelligence, experience, general understanding of constitutional rights, desire to avoid a greater penalty, and representation by competent counsel at the plea submission hearing are all factors which might be appropriately taken into consideration. *See Blankenship*, 858 S.W.2d at 904. Also, as noted in *Johnson v. State*:

> [I]f the transcript shows that the petitioner was aware of his constitutional rights, he is not entitled to relief on the ground that the mandated advice was not given. Also,

if all the proof presented at the post-conviction hearing, including the transcript of the guilty plea hearing, shows that the petitioner was aware of his constitutional rights, he is not entitled to relief.

*Johnson*, 834 S.W.2d 922, 926 (Tenn. 1992).

Upon review of the record, we initially agree with the post-conviction court that the transcript of the petitioner's plea submission hearing demonstrates omission by the trial court in specifically admonishing the petitioner about his right to confront witnesses and the privilege against compelled self-incrimination. However, we disagree with the post-conviction court's interpretation of *Boykin* to ultimately conclude that the petitioner "did not voluntarily and understandingly enter his plea of guilty." To begin, a careful reading of *Boykin* reveals that the case involved a silent record where there was absolutely no showing that the guilty plea was knowingly and voluntarily entered. Indeed, in *Brady v. United States*, 397 U.S. 742 (1970), the Supreme Court cited the decision in *Boykin* while upholding a guilty plea as voluntary and intelligent even though the defendant had not been specifically advised of the three rights discussed in *Boykin*. The Supreme Court elaborated on the holding of *Boykin* by stating, "[t]he new element added in *Boykin* was the requirement that the record must affirmatively disclose that a defendant who pleaded guilty entered his plea understandingly and voluntarily." *Brady*, 397 U.S. at 747-48 n.4. Accordingly, it has been recognized that the explicit articulation of the *Boykin* rights is not the *sine qua non* of a valid guilty plea. Rather, the "core requirement of *Boykin* is 'that no guilty plea be accepted without an affirmative showing that it was intelligent and voluntary.'" *Blankenship*, 858 S.W.2d at 904 (citation omitted).

In our view, the appellate record reflects affirmatively that the petitioner's plea of guilt was knowingly and voluntarily entered. While we need not reiterate the extensive findings of fact made by the post-conviction court, we note that the plea hearing transcript clearly indicates that the petitioner understood the charges against him and the punishments involved, that he discussed the charges with his attorneys, that his attorneys went over the guilty plea and waiver forms with him, that he was satisfied with his attorneys' representation, that he had not been pressured into pleading guilty, and that he was pleading guilty knowingly and voluntarily. The petitioner was also asked by the trial court if he had any questions, and the petitioner responded in the negative. It is well-established that the petitioner's testimony at a plea hearing that his or her plea is voluntary is a "formidable barrier in any subsequent collateral proceedings" because "[s]olemn declarations in open court carry a strong presumption of verity." *Blackledge v. Allison*, 431 U.S. 63, 74 (1977).

Although the trial court did not specifically enumerate the "right against compelled self-incrimination," the court expressed the following:

Court: Do you understand that by pleading guilty to the offense of murder in the first degree, you admit you're guilty of that offense. Do you understand that?

Petitioner: Yes, sir.

| Court: | That's the strongest proof and the strongest evidence known to mankind is your admission of guilt, and that would be sufficient evidence for me to find you, in fact, guilty of murder in the first degree. Do you understand that? |
| --- | --- |
| Petitioner: | Yes, sir. |
| Court: | I'm sure you have given this a lot of thought and discussed it many times with your lawyers. Is this what you want to do? |
| Petitioner: | Yes, sir. |

In our view, this particular exchange demonstrates that the petitioner understood he would not be compelled to incriminate himself. We further note that the trial court questioned the petitioner concerning the "written plea of guilty" the petitioner had signed. The plea of guilty form [1] includes the following declaration: "The defendant also states to the Court that his attorney being present, . . . has fully informed him of all of his rights and that after a full explanation of the rights, the defendant informed his attorney that he wanted to voluntarily enter a plea of guilty." This declaration appears to be corroborated by evidence introduced at the petitioner's first evidentiary hearing.[2]

In sum, the record reflects that the petitioner understood the options available to him prior to entering his guilty plea, including his right not to plead guilty and demand a jury trial. He was made aware of the consequences of the guilty plea, and he made an informed decision among the alternative courses of action available. *See North Carolina v. Alford*, 400 U.S. 25, 31 (1970). The totality of the circumstances surrounding the entry of the guilty plea, the history of this case, the transcript of the plea hearing, and the documents signed by the petitioner support this conclusion. *See State v. Turner*, 919 S.W.2d 346, 353 (Tenn. Crim. App. 1995) (noting that a reviewing court may look to any relevant evidence in the record to determine the voluntariness of the plea). As to the trial court's failure to precisely enumerate two of the *Boykin* rights, we find the omission was, at most, harmless error as the record establishes that the petitioner's guilty plea was knowing and voluntary. Accordingly, the post-conviction court erred in its decision to grant the petitioner relief.

## CONCLUSION

Based upon the foregoing authorities and reasoning, we conclude that the post-conviction court erred in its determination that the petitioner entered an unknowing and involuntary guilty plea. We reverse the judgment of the post-conviction court and thereby deny the petitioner post-conviction relief.

---

[1] While the post-conviction court noted that " the guilty plea form was not introduced," the state submits that the form appears in the "technical record." In any event, the guilty plea form is included in the record on appeal.

[2] As an example, we note the petitioner's first evidentiary hearing indicates that the petitioner was informed of his *Miranda* rights, which includes the right against compelled self-incrimination.

_____
J.C. McLIN, JUDGE